2020 IL App (1st) 200066-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
January 21, 2020

No. 1-20-0066

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE CHICAGO LODGE NO. 7, KEVIN GRAHAM, PATRICK J. MURRAY, MARTIN PREIB, JAY R. RYAN, MICHAEL P. GARZA, JOHN CAPPARELLI, and ROBERT BARTLETT, | ) ) ) ) ) | |
| | ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) | Cook County |
| | ) | |
| v. | ) | No. 19-CH-14703 |
| | ) | |
| CITY OF CHICAGO, CHICAGO POLICE DEPARTMENT, LORI LIGHTFOOT, in her official capacity as Mayor of the City of Chicago, CHARLES BECK, in his official capacity as Interim Superintendent of the Chicago Police Department, and FRED L. WALLER, in his official capacity as Chief of the Bureau of Patrol, | ) ) ) ) ) ) ) ) | The Honorable Eve M. Reilly, Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:*   Circuit court's order denying union's emergency motion for temporary restraining order seeking injunction in aid of arbitration in labor dispute is affirmed. Parties ordered to arbitration within 30 days.

¶ 2    The plaintiffs in this matter are the Fraternal Order of Police Chicago Lodge No. 7, a labor organization that is the collective bargaining representative of all sworn personnel below the rank of sergeant employed by the Chicago Police Department, as well as several of its officers, Kevin Graham, Patrick J. Murray, Martin Preib, Jay R. Ryan, Michael P. Garza, John Capparelli, and Robert Bartlett. We will refer to the plaintiffs collectively as "the Lodge." The Lodge has filed a verified complaint for declaratory judgment and injunctive relief, in which it named as defendants the City of Chicago, the Chicago Police Department, Lori Lightfoot in her official capacity as mayor of the City of Chicago, Charles Beck in his official capacity as interim superintendent of the Chicago Police Department, and Fred L. Waller in his official capacity as the chief of the bureau of patrol of the Chicago Police Department. Unless otherwise indicated, we will refer to the defendants collectively as "the CPD." The Lodge appeals from the circuit court's order denying its emergency motion for a temporary restraining order (TRO), in which it sought an injunction in aid of arbitration to prevent the CPD from implementing a change in shift start times for police officers in the patrol division and a reduction in the number of day-off groups for officers in district 6, pending arbitration of these issues, and ordering the defendants to proceed to expedited arbitration on the grievances filed by the Lodge. For the following reasons, we affirm the judgment of the circuit court. However, we order both parties to do what is necessary to arbitrate the issues of work schedules and day-off groups within 30 days of the entry of this order.

¶ 3                                    I. BACKGROUND

¶ 4    The supporting record in this appeal demonstrates that, since about 2009, most patrol officers in the Chicago Police Department have had a work schedule in which they work an 8.5-hour shift for four consecutive days and then have two days off. They work in three shifts. Within each shift, some officers have an early start time, and others have a late start time. Thus, a patrol officer

working the midnight shift works from either 9:00 p.m. to 6:00 a.m. or 11:30 p.m. to 7:30 a.m. A patrol officer working the day shift works from either 5:30 a.m. to 2:30 p.m. or 7:00 a.m. to 4:00 p.m. And a patrol officer working the afternoon shift works from either 2:00 p.m. to 11:00 p.m. or 3:30 p.m. to 12:30 a.m. Which two days a patrol officer then has off depends on which of six "day-off groups" the officer is assigned to. All the officers assigned to a given day-off group have the same two days off. Patrol officers usually team up with partners for their patrol duties, and the partners are normally assigned to the same day-off groups so they can work together. Officers remain part of the same day-off group for long periods of time. This enables officers to know far in advance which days they will have off in a given year.

¶ 5        In 2017, the United States Department of Justice, Civil Rights Division, and the United States Attorney's Office for the Northern District of Illinois issued a report following an investigation of the CPD to determine whether it was engaged in a pattern or practice of unlawful conduct relating to the use of force by officers within the CPD. One finding of the report was that the rotational work schedule for patrol officers meant they were not consistently scheduled to be supervised by the same sergeants or lieutenants, which "prevents supervisors from establishing mentoring relationships with officers and providing guidance targeted to the particular needs of each individual officer." A federal lawsuit was then filed seeking to implement reforms recommended in the report, which resulted in the entry of a consent decree on January 31, 2019. One provision of that consent decree is that beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve "unity of command," meaning that "officers and their immediate supervisor will regularly have the same start time, the same day-off-group, and patrol the same geographic areas."

¶ 6      On August 19, 2019, a meeting occurred between representatives of the Lodge and representatives of the CPD. At this meeting, representatives of the CPD informed the representatives of the Lodge that CPD intended to reduce the number of day-off groups from six to three in one of the districts of the CPD (District 6) as part of a pilot program.

¶ 7      On November 13, 2019, the CPD's chief of the bureau of patrol issued a memorandum stating that effective January 9, 2020, modified start times would be implemented. Under the new start times, a patrol officer working the midnight shift would work from either 10:00 p.m. to 7:00 a.m. or 11:00 p.m. to 8:00 a.m. A patrol officer working the day shift would work from either 6:00 a.m. to 3:00 p.m. or 7:00 a.m. to 4:00 p.m. And a patrol officer working the afternoon shift would work from either 2:00 p.m. to 11:00 p.m. or 3:00 p.m. to midnight.

¶ 8      The Lodge and CPD are currently operating under a collective bargaining agreement (CBA) and, since 2017, they have been in the process of negotiating a successor agreement. The current CBA provides a grievance procedure for resolving disagreements between the parties "concerning interpretation and/or application of this Agreement or its provisions." This procedure involves the filing of a grievance and a multi-step process to resolve the grievance. The final step of this process is arbitration, which "either party may at any time demand."

¶ 9      Pursuant to this procedure, on November 26, 2019, the Lodge filed a grievance of the CPD's proposed implementation in district 6, effective January 9, 2020, of a new work schedule eliminating three of the six day-off groups and changing the start times that had been negotiated a decade earlier. On December 17, 2019, the Lodge filed a second grievance of the CPD's implementation of the change in start times that had been previously negotiated. In both of these grievances, the Lodge demanded expedited arbitration of the matters and sought to have the changes delayed until a successor collective bargaining agreement could be reached.

¶ 10    On December 19, 2019, the Lodge filed its verified complaint for declaratory and injunctive relief in this case. The following day, it filed an emergency motion for a TRO. In that motion, the Lodge sought an injunction in aid of arbitration restraining the CPD from implementing a change in start times for all patrol division officers and reducing the day-off groups for officers in district 6, pending a decision by an arbitrator concerning the issues raised by the Lodge's grievances. The Lodge also sought an order compelling the CPD to proceed to expedited arbitration.

¶ 11    On January 3, 2020, the CPD was granted leave to file *instanter* its response opposing the Lodge's emergency motion for a TRO. The Lodge was then granted leave to file a reply. On January 8, 2020, the circuit court entered an order denying the Lodge's emergency motion for a TRO. The circuit court found that the underlying grievance was one that the parties were contractually bound to arbitrate, and that the Lodge had shown sufficient likelihood of success on the merits in arbitration. However, the circuit court found that the Lodge had not demonstrated that the hardships caused to officers by the change in their work schedules rose to the level of irreparable harm necessary to justify injunctive relief. It determined that the status quo of the former scheduling procedures could be reinstated if the arbitrator decided in the Lodge's favor. It also determined that the Lodge had not sufficiently established that it would suffer more from the denial of an injunction than the CPD would suffer from its issuance. However, the circuit court stated that it "strongly urge[d] the parties to set aside their differences, go back to the negotiating table, and do what they can to minimize any harm to our Police Officers who work so hard to serve and protect this city."

¶ 12    The Lodge then filed a timely notice of interlocutory appeal of the circuit court's order.

¶ 13                                    II. ANALYSIS

¶ 14   This interlocutory appeal comes before this court upon the circuit court's denial of an emergency motion for a TRO. Illinois Supreme Court Rule 307 (eff. Nov. 1, 2017) permits the interlocutory appeal as of right from a circuit court's order denying a TRO. We will reverse such an order only if we determine that the circuit court abused its discretion in denying the TRO. *American Federation of State, County, & Municipal Employees, Council 31 v. Ryan*, 332 Ill. App. 3d 965, 967 (2002). As a TRO is a drastic remedy, it may issue only in exceptional circumstances. *Id.* at 966. Its purpose is to preserve the status quo until the circuit court can conduct a hearing to determine whether it should grant a preliminary injunction. *Id.* However, as this TRO was sought with notice, it required the same elements of proof as a preliminary injunction. *In re Estate of Wilson*, 373 Ill. App. 3d 1066, 1075 (2007).

¶ 15   The relief sought by the Lodge was an injunction in aid of arbitration in a labor dispute. Before the circuit court and this court, the parties have presented their argument under the framework adopted by the Fifth District for the issuance of such injunctive relief in *American Federation of State, County & Municipal Employees, Council 31 v. Schwartz*, 343 Ill. App. 3d 553, 559-61 (2003). In *Schwartz*, the court began by noting the policy under both federal and Illinois law prohibiting injunctions in peaceful labor disputes involving arbitral issues. *Id.* at 559-60 (citing 29 U.S.C. §§ 101 through 115 (1982), and 820 ILCS 5/1 *et seq.* (West 2002)). This policy is rooted in a concern for fostering the growth and viability of labor organizations and encouraging parties to work out their differences without judicial involvement. *Id.* at 561 (citing *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 252 (1970); *Oil, Chemical & Atomic Workers International Union, AFL-CIO, Local 2-286 v. Amoco Oil Co.*, 885 F.2d 697, 701 (10th Cir. 1989)). The *Schwartz* court recognized that, notwithstanding that anti-injunction legislation, the United States Supreme Court had allowed federal courts to consider the propriety of an

injunction where necessary to preserve the arbitral process. *Id.* at 560 (citing *Boys Markets, Inc.*, 398 U.S. at 254). It further recognized that under this precedent, federal courts had allowed injunctions against employers to maintain the status quo in labor disputes pending arbitration. *Id.*

¶ 16     It then adopted the exception to the anti-injunction statutes employed in *Aluminum Workers International Union, AFL-CIO, Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437, 442 (6th Cir. 1982). *Schwartz*, 343 Ill. App. 3d at 560-61. It noted that this exception "permits an injunction against an employer when the injunction is necessary to maintain the status quo in order to protect the integrity of the arbitral process." *Id.* at 561; see also *International Ass'n of Firefighters Local No. 23 v. City of East St. Louis*, 206 Ill. App. 3d 580, 586 (1990) (injunctions permitted "where arbitration without maintenance of the status quo would render that arbitration meaningless"); *Aluminum Workers International Union*, 696 F.2d at 441 (the exception is directed at "employer behavior which has the effect of evading a duty to arbitrate or which would otherwise undermine the integrity of the arbitral process").

¶ 17     To obtain injunctive relief under this exception, it must first be shown that the underlying grievance is one that the parties are contractually bound to arbitrate. *Schwartz*, 343 Ill. App. 3d at 561; *Aluminum Workers International Union*, 696 F.2d at 442. Here, the CPD does not challenge on appeal the circuit court's determination that the Lodge established that the parties are contractually bound to arbitrate the grievance at issue.

¶ 18     In addition to showing the arbitrability of the underlying dispute, it must also be shown "that injunctive relief is warranted under 'ordinary principles of equity.' " *Aluminum Workers International Union*, 696 F.2d at 442. "Specifically, the union must demonstrate that breaches of the agreement are occurring and will continue, or have been threatened and will be committed; that the union has suffered or will suffer irreparable harm as a result; and that the union will suffer

more from denial of the injunction than the company will from its issuance." *Id.* (citing *Boys Markets, Inc.*, 398 U.S. at 254); see *City of East St. Louis*, 206 Ill. App. 3d at 586.[1]

¶ 19    However, for injunctive relief sought in the context of labor arbitration, the requirement that a party seeking injunctive relief demonstrate a likelihood of success on the merits of the grievance is not literally applied, because predetermining the merits of the dispute would encroach on the responsibilities of the labor arbitrator. *Aluminum Workers International Union*, 696 F.2d at 442 n. 2; see *Schwartz*, 343 Ill. App. 3d at 564.  Instead, courts merely require a showing that the position to be advanced in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. *Schwartz*, 343 Ill. App. 3d at 564. In other words, if it is shown that there is a genuine dispute with respect to an arbitrable issue and the union's position is not frivolous, this is a sufficient showing of likelihood of success on the merits. *Id.* In this case, CPD does not dispute the trial court's determination that the Lodge has made a sufficient showing under this standard.

¶ 20    Thus, returning to the question of whether the Lodge has demonstrated that injunctive relief is warranted under ordinary principles of equity, we conclude that the Lodge has sufficiently shown that its alleged breaches of the CBA (*i.e.*, CPD's implementation of changes to work schedules and day-off groups) are occurring and will continue or have been threatened and will be committed. See *Aluminum Workers International Union*, 696 F.2d at 442. We express no opinion on whether these alleged breaches are actual breaches, as such a determination is the responsibility of the arbitrator.

---

[1] To the extent that *Schwartz* implies that that injunctive relief is available if only one of these three principles of equity are established (see *Schwartz*, 343 Ill. App. 3d at 561), this does not appear to be a correct statement of the law set forth in *Aluminum Workers International Union*, 696 F.2d at 442. It appears that a correct statement of this law, requiring all three bases of equitable injunctive relief to be established, was set forth in *City of East St. Louis*, 206 Ill. App. 3d at 586. It also appears that the *Schwartz* court did consider all the elements in its analysis of the case. *Schwartz*, 343 Ill. App. 3d at 562-64.

¶ 21        We next consider whether the Lodge sufficiently established that it has suffered or will suffer irreparable harm if the changes in work schedules or day-off groups are implemented by the CPD. In the labor arbitration context, "irreparable harm is injury so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party, rendering the award an empty victory." *Schwartz*, 343 Ill. App. 3d at 561 (citing *Aluminum Workers International Union*, 696 F.2d at 443). By doing so, the harm undermines the arbitral process thus justifying an injunction. *Id.*

¶ 22        With respect to the work schedule changes, the Lodge argues on appeal that its patrol officer members will suffer irreparable harm in that the changed start-times and end-times for shifts prevent officers from being available at times when they need to fulfill their childcare responsibilities. As an example, the Lodge filed multiple affidavits from officers who work the midnight shift that currently ends at 6:00 a.m. Each of them has childcare responsibilities that they are able to fulfill by leaving work at that time, such as getting children ready for school, transporting children to school, or relieving a spouse or other caregiver who needs to leave for work. Under the new schedule in which the affiants' shift would end at 7:00 a.m., they would no longer be able to fulfill these childcare responsibilities. They would have to make alternative arrangements, which can be difficult and expensive to procure. They would also be forced to forego quality time with their children in the mornings. The Lodge argues that there is no adequate remedy at law that can compensate the officers for this loss, as any arbitration award can only reinstate the former work schedule, and the losses they would occur in the meantime are not something capable of compensation through damages.[2]

_____

[2] In its argument that irreparable harm can exist in cases where losses are small but recurrent or not compensable through money damages, the Lodge cites a number of cases that do not arise in the context of

¶ 23    With respect to the day-off groups, the Lodge points out that officers team up with partners for patrol duties. The practice is that partners will be part of the same day-off groups, so that they can work on the same days of the week. The Lodge argues that officers in district 6 who have had partners for years may not be able to maintain those partnership relationships if three of the day-off groups are eliminated, and they filed affidavits demonstrating that this has in fact occurred. They argue that officers will lose the peace of mind and security that comes from working with the same partners, which is needed to assure backups in dangerous situations.

¶ 24    We do not believe that the injuries identified by the Lodge from the CPD's proposed changes to work schedules and day-off groups meets the standard of irreparable harm necessary to justify an injunction in aid of arbitration. We reiterate that, in this context, the injury must be something that "undermines the arbitral process." *Schwartz*, 343 Ill. App. 3d at 561. The injuries identified by the Lodge do not rise to this level.

¶ 25    In *Schwartz*, the court affirmed the issuance of an injunction against the Illinois Department of Central Management Services' implementation of a one-day furlough of 44,000 state employees, pending a decision by an arbitrator on a grievance that the union had filed under the applicable collective bargaining agreement. *Id.* at 556-58. The union argued that a favorable arbitration award was unlikely to afford relief to improperly laid-off employees because the enormity of the damages would have such a large impact on the state's budget that CMS would move to vacate such an award on the grounds that it would prevent CMS from discharging its duties, and it presented evidence that CMS had successfully sought to vacate such an award in a

---

injunctions in aid of arbitration in labor disputes. We have reviewed these cases, but we find that they do not assist with our analysis of whether irreparable harm exists in this specialized context.

past circumstance. *Id.* at 562-63. The court agreed that the union had sufficiently shown irreparable harm to the affected employees. *Id.* at 563.

¶ 26 By contrast, in *City of East St. Louis*, the court reversed the circuit court's denial of a motion to dissolve a preliminary injunction prohibiting a municipality from laying off 30 firefighters pending arbitration. *City of East St. Louis*, 206 Ill. App. 3d at 581. The court determined that the union representing the firefighters had not shown that it would suffer the type of irreparable harm from the layoff necessary to justify the injunction. *Id.* at 587. The record contained no evidence of the municipality's inability to reinstate and pay back-wages to the laid-off firefighters if the union prevailed in the arbitration. *Id.* The court further found that the other harms claimed, including danger of fatigue, lack of manpower, and the need to work longer hours for which the firefighters would not be paid, were speculative and not of the type that threatened the integrity of the arbitral process. *Id.*

¶ 27 In this case, there is nothing that would lead us to conclude that, as in *Schwartz*, the injury is so great that any potential arbitration award would be an empty victory and the arbitration could be meaningless without an injunction to preserve the status quo. Rather, the harm at issue here is more similar to that in *City of East St. Louis*. There is no evidence here that the former work schedules and day off groups could not be restored in arbitration. The losses pertaining to childcare responsibilities and changed patrol partnerships are similar to the danger of fatigue, lack of manpower, and need to work longer hours in *City of East St. Louis*, in that they are "not the type which threaten the integrity of the arbitral process." *Id.* The fact that a potential arbitration award might not compensate for the full extent of disruption that may occur in officers' lives from the changes to the work schedule or day-off groups does not render the arbitration meaningless or justify an injunction. *Columbia Local, American Postal Workers Union, AFL-CIO v. Bolger*, 621

F.2d 615, 618 (4th Cir. 1980) ("That there might be some measure of difficulty in devising appropriate compensatory relief for any employees found in the arbitral process to have been transferred in violation of the bargaining agreement does not make of the process a hollow formality"); *Independent Oil & Chemical Workers of Quincy, Inc. v. Procter & Gamble Manufacturing Co.*, 864 F.2d 927, 932 (1st Cir. 1988) ("If disruption of workers' lives and habits [from changes in work schedules] was deemed sufficient harm on which to bottom injunctive relief, then the exception would swallow the rule, and the courts would be mired hip-deep in matters which Congress intended to remit to an arbitral forum").

¶ 28    As we have concluded that the Lodge has failed to establish irreparable harm, it is unnecessary for us to consider the third equitable principle of whether the Lodge would suffer more from the denial of the injunction than the CPD will suffer from its issuance. Only in cases where irreparable harm is shown does a court need to balance that harm against the harm to be suffered by the party against which relief is sought. See *Aluminum Workers International Union*, 696 F.2d at 444.

¶ 29    The Lodge additionally argues that the circuit court abused its discretion by determining that section 28.2 of the CBA did not entitle the Lodge to the injunction it sought to preserve the status quo. Section 28.2 of the CBA provides, "Notwithstanding any provision of this Article or Agreement to the contrary, this Agreement shall remain in full force and effect after any expiration date while negotiations or Resolution of Impasse Procedure are continuing for a new Agreement or part thereof between the Parties." For a court to find that this provision of the CBA provides for an injunction to preserve the status quo with respect to either work schedules or day-off groups, a court would have to engage in contract interpretation to determine what the CBA allows in terms of changes to work schedules or day-off groups. Interpreting the CBA is the role of the arbitrator

in this case, not the courts. We find that the trial court did not abuse its discretion in concluding that the Lodge was not entitled to an injunction in aid of arbitration under section 28.2.

¶ 30    Finally, in both *City of East St. Louis* and *Aluminum Workers International Union*, although the courts determined that irreparable harm would not be caused to the employees even though they were likely to suffer damages in the meantime for which compensation through arbitration would be difficult, those courts noted that such harm to the employees would be "less likely to materialize if both parties proceed with arbitration in a timely manner." *City of East St. Louis*, 206 Ill. App. 3d at 587; *Aluminum Workers International Union*, 696 F.2d at 444. Similarly here, the circuit court stated that it "strongly urge[d] the parties to set aside their differences, go back to the negotiating table, and do what they can to minimize any harm to our Police Officers who work so hard to serve and protect this city." We agree with this sentiment but go further than the trial court. Pursuant to our powers under Illinois Supreme Court Rule 366(a) (eff. Feb. 1, 1994), to minimize the harm to the affected police officers we order both parties to do what is necessary to arbitrate the issues of work schedules and day-off groups within 30 days of this order.

¶ 31                                III. CONCLUSION

¶ 32    For the foregoing reasons, we affirm the judgment of the trial court. We further order both parties to do what is necessary to arbitrate the issues of work schedules and day-off groups within 30 days of today's order.

¶ 33    Affirmed.

¶ 34    Arbitration of issues of work schedules and day-off groups to occur within 30 days.